## DRIGGERS v. UNITED STATES.

No. 675, Ind. T.   Opinion Filed May 13, 1908.

(95 Pac. 612.)

1. **CRIMINAL LAW—Conspiracy—Evidence—Acts and Statements of Co-conspirators Prior to Formation.** Where the guilt of one of several defendants, jointly indicted for a felony, is sought to be established by evidence showing, or tending to show, a conspiracy between him and the others for the commission of the crime, evidence as to acts or statements of the others must be confined to such statements as were made, or acts done, at times when the proofs in the case permit of a finding that a conspiracy existed, and the acts or statements of one of the defendants prior to the formation of the conspiracy are inadmissible as evidence against others.

2. **WITNESS—Impeachment—Prior Consistent Statement.** It is a general rule that where evidence of contradictory statements is offered to impeach the credit of a witness, evidence of statements made by him on former occasions consistent with his evidence are inadmissible. But, where it is charged that the evidence of the witness is a recent fabrication, and is the result of some relation to the party or cause, or of some motive or personal interest, his evidence may be supported by showing that he had made a similar statement before that relation or motive existed.

3. **CRIMINAL LAW—Hearsay Evidence—Former Evidence—Death of Witness—Return on Subpoena.** Proof of the return of an officer on a subpoena that the witness is dead, the same not being authorized or required by law, and by the oral evidence of witnesses that they had been informed of his death, is insufficient to establish this as a fact to render competent in a final trial the testimony of such witness taken and transcribed at the preliminary examination.

4.     **SAME—Accomplice—Instruction—Question for Jury.** Whether a witness is an accomplice requiring corroboration to support a conviction is a question of fact for the jury, and hence an instruction that under Mansf. Dig. section 2259 (Ind. T. Ann. St. 1899, section 1602), a conviction cannot be had on the testimony of an accomplice unless corroborated was sufficient, and it was not error not to further charge that a certain witness was an accomplice. If defendant regards the word "accomplice" as a technical one requiring a definition by the court, he should so request, but not ask an instruction that a certain witness is an accomplice; that being a question for the jury.

5.     **HOMICIDE—Instruction—"Mutual Combat."** A charge that if defendant was informed and believed that the deceased had taken possession of a field claimed by him, and that he would be there with an armed party on the morning of the killing, and that they had made threats against the life of defendant, and the defendant, knowing all of these things, voluntarily organized a party, arming them with deadly weapons for the purpose of meeting said parties in deadly conflict, going to the place of the killing, and a conflict ensued, and the deceased was killed, then such conflict was a "mutual combat," and all parties who knowingly and intentionally engaged in it are guilty of murder, was not, under the theory of the prosecution and the evidence in this case, erroneous.

(Syllabus by the Court.)

*Appeal from the United States Court for the Southern District of the Indian Territory, at Pauls Valley; before J. T. Dickerson, Judge.*

B. F. Driggers was convicted of murder, and brings error. Reversed and remanded.

October 3, 1903, the grand jury of the United States Court for the Southern District of Indian Territory returned its indictment, charging B. F. Driggers, Tom McCarter, John Underwood, and Ted Bennett, with the murder of Robert G. Brady, and L. W. Goff as a principal, in the second degree as to each of them. Goff was placed on trial at Ada; and after his conviction, the venue was changed, for the trial of the other defendants, to Pauls Valley, at which place the appellant in this case was placed on trial, in June, 1905, and the jury returned a verdict finding him guilty in the manner and form charged, without capital punishment. A

motion for new trial was filed and overruled, the defendant saving his exception, and the case was taken to the United States Court of Appeals of Indian Territory by writ of error.    On September 26, 1905, that court affirmed the judgment of the lower court. *Driggers v. U. S.* 104 S. W. 1166.   A petition for rehearing was filed, which was . pending at the time Indian Territory was admitted as a state, and the case is in· this court by virtue of the terms of the enabling act.

On the consideration of the petition for rehearing this court granted it, and on the hearing on the merits of the case the Attorney General, represented by Hon. W. A. Ledbetter, filed his answer to the contentions of appellant, and admitted error in the record sufficient to require us to reverse the prior decision rendered herein.   He admitted that the admission of the testimony of witnesses Rhea and Saddler was erroneous, and then· said: "There are other errors in the case, which⋆ will doubtless receive the attention of the court." In view of the fact that we concur in the conclusion reached by the Attorney General's office, it will be unnecessary for us to discuss in detail and at length many of the propositions urged upon the attention and considered by Mr. Justice Clayton, who wrote the opinion for the United States Court of Appeals of Indian Territory, but will confine our discussion to those matters which, at the trial of the case anew, will probably arise again.

The scene of the homicide was at a farm, located near the little town of Jesse, in the Chickasaw Nation in Indian Territory. An Indian woman by the name of Colbert owned this land, which she had leased to a merchant by the name of McNeal.    He, in turn, had rented the place, for the year 1902, to one of the defendants named in the indictment (Goff) and a man by the name of Riley.    A crop of cotton had been raised on one part of the land, and a crop of corn on the other, the two crops joining, but without any fence or other division between them.    Driggers, ·the defendant, who lived in that neighborhood, some time in the month of

October, 1902, bought the right to run his stock in the cornfield after the corn was gathered, paying therefor the sum of $50. Riley and Goff had not picked their entire crop of cotton; and, there being no fence between the cornfield and the unpicked cotton, the defendant Driggers did not turn his cattle in, under an agreement with his vendors that they would protect him and see that he was permitted to turn in after the cotton crop was gathered. Goff claimed that he had rented the land from McNeal for the year 1903, and it was under this asserted right of his that he agreed that Driggers might have the benefit of the stock field, notwithstanding the fact that the cotton crop was not all gathered at the end of December, 1902. McNeal testified that he had not rented to Goff, but the evidence shows that if he had, he changed his mind, and rented the land to Robert G. Brady, the deceased, who was living in that neighborhood, running cattle, and who, desiring to use the stock field, the day before the homicide, started to run a fence across the land dividing the cotton field from the stock field, so that his cattle might run therein without interfering with the unpicked cotton crop. While he was engaged with his hands in the construction of this fence, Goff came to him in the afternoon, and, according to the testimony of Kelley, said to Brady:

" 'What the hell are you doing here? This is my land.' I told him McNeal had rented the place to Brady. I walked on down the line a piece, and walked on up to where Brady was. Goff, it seems to me, stayed there a while, and went back and came back with an Indian, Tom McCarter [who was a son-in-law of the woman who owned the land.] Q. What was then said? A. Well, there wasn't a great deal said, more than Brady told him. He says he didn't want to hear any more of his noise. He [Goff] said: 'If you put any cattle in here'—I understood him to say he would kill the cattle. As we started away, he said: 'If you put any cattle in here, I will kill you.' He stood there and talked, and he says: 'Put them in, and I will be with you, God damn you.' Brady didn't seem to pay any attention to him."

This testimony was offered on the theory that a conspiracy

had been formed between Goff and the defendant McCarter, which was subsequently joined by Driggers, and that it was admissible, as against Driggers, by virtue of this fact. It was objected to on the part of the defendant, and its admission is assigned as one of the errors. Goff immediately went down to where Driggers lived for the purpose of informing him of the presence of Brady on the land, of the adverse claim, and the building of the fence. Driggers was not at home, but returned that night about 10 or 11 o'clock, and then learned that Brady was going to turn cattle in the cornfield. During the rest of that evening, and that night, the defendants here gathered together Winchesters and shotguns and ammunition, and arming themselves with them, appeared next morning inside the field, along the highway where it was expected Brady would drive his cattle near to turn them in. Driggers testified that he and Kelley were enemies, and that he expected that he would accompany Brady when he came with the cattle; that he expected to drive them out if they were turned in; that his presence and his purpose in going to the field with the parties named, armed as they were, was that he believed that when Brady saw they were there, he would not come up; that he supposes that he was there to resist any trouble that Kelley would bring about, and that he thought he would keep the cattle out. On the morning of the difficulty a man by the name of French Curtiss came down, ahead of the Brady party, in a wagon, with some wire and posts for the purpose of completing the wire fence; and on arriving at a point in the road near where Driggers and Goff and the other parties stood inside the field, and on the south side of the cross-fence, Goff told him to go back, and to get back quick. Curtiss testified that Driggers told him to go back and to tell them not to bring the cattle there. A short time after Curtiss turned back, the cattle were driven down the road by Brady, Kelley, and two brothers by the name of Saddler. Across the road, and nearly opposite the place where the defendants stood on the inside of the field, was a

farm inclosed in a wire fence, the gate to which was either open or down, and when the cattle came opposite this point, some of them ran into this inclosure. The deceased, turning his horse out of the highway, ran in and drove these cattle out, crossed the road, and stopped near the Driggers party, got down from his horse, and, according to the evidence of the prosecution, began to arrange his saddle blanket, or at least handle his saddle, and it is at this time, it is asserted, without any overt act on his part, he was fired upon by the party with which defendant was connected, fell to the ground, arose, staggered or ran across the highway, and fell lifeless. Kelley, who had not dismounted, was also fired upon, receiving wounds, and his horse was killed. The Saddler boys both retreated. According to the testimony of the defendant, Brady rode up within four or five feet of the fence near where Driggers stood, got down off of his horse, pulled up the knee wire of the wire fence about 2½ feet, took hold of the post, when defendant said: "Brady, don't you pull that fence down." He jerked the fence down and ran backwards, grabbed for his gun and jerked at the fence all at the same time, and ran backwards, trying to get his gun; pulled it out, so that defendant saw it, who told him not to pull it. That he then shot him, or shot at him, with a No. 12 shotgun, loaded with B. B. shot, when he was about 12 or 15 feet from the fence. That he then shot at Kelley, whose horse fell with him across the road near the other fence.

The witness Tom McCarter, who was jointly indicted with Driggers, but who was offered as a witness on the part of the government, testified that at the time Brady got on the ground, and about the time the shooting commenced, he heard Driggers say to him: "Brady, don't you do that." Kelley, who was placed on the stand as a witness for the government, testified:

"When Brady came out of the gate with those cattle, he rode in a northwest direction in the middle of the lane, and got off of his horse in the neighborhood of the middle of the lane. I had stopped, was simply moving a little at this time, on the right of

Brady. I was watching to see what he was doing, and to see what these parties were doing. And he kind of put his hand on the saddle, just as though he was going to pull the saddle up, and raised his head to look. That was the first time he looked towards them. And Driggers shot."

Contradicting and impeaching Kelley and the testimony which he gave in reference to what Brady was doing at the time the shooting was done, the defendant introduced a witness by the name of Boatright, who testified that, on the same day of the shooting, at his home Kelley stated that Brady got off his horse, and went over and took hold of the fence post, and that Driggers shot him. The government then, for the purpose of supporting Kelley and his testimony, and to show that the statement which he had made on the witness stand was in consonance with previous statements which he had made concerning the same matter, consistent with his evidence, introduced witness Rhea, who had a talk with Kelley. the defendant, after he was wounded, concerning these matters. He testified that: "Kelley at that time did not say anything about the fence any more than Brady went inside the fence and drove some cattle out, came out, and got down off of his horse, pulled his saddle up, and just as he turned his head, the shooting commenced." To this testimony of Rhea the defendant objected and excepted, and that it is error is most strenuously insisted.

On the preliminary examination which took place before a United States commissioner, Jim Saddler, one of the parties who accompanied Brady to the scene of the homicide, testified concerning the affray. It is not necessary for the purpose of this case to recite his testimony here, but it was most material, and in many ways in conflict with the evidence of the defendant. On the trial of the cause he was not present, but the government introduced his written evidence as transcribed by the commissioner, upon a showing that by general report Saddler was dead, one witness testifying that his wife told him that her husband was dead; and the return of the subpœna, which was issued for him, made by the marshal who sought to serve it, while not appearing in the

record, is conceded to have been by both parties, returned that he was dead.   The record is voluminous, a great number of witnesses being introduced, and a great amount of evidence being offered, but the foregoing statement of facts is sufficient for the purpose of this opinion.

*H. M. Carr, Crawford & McKeown, Cruce & Cruce, Moman Pruiett,* and *Potter, Bowman & Potter,* for appellant.

*Charles J. West, Attorney General,* and *W. A. Ledbetter, Assistant Attorney General,* for the State.

Dunn, J. (after stating the facts as above) :   From the conclusion to which the court has come, that it will be necessary to reverse the case and grant to defendant a new trial, we will note the assignments of error only which in the new trial granted will be liable to again arise.

The first and second assignments of error, made by appellant, are the usual ones, that the verdict was contrary to the law and the evidence.   The third assignment of error is an averment that:

"The court erred in permitting the government witness, Kelley, to testify, over the objection of defendant, to a conversation between the deceased, Brady, and one Goff, on the day before the difficulty, because the defendant was not present at such conversation, and because no conspiracy is shown to have existed at that time between the said Goff and the defendant, and the said testimony was purely hearsay."

This evidence was admitted by the court under the theory that a conspiracy existed between Goff, McCarter, and the defendant, or between Goff and McCarter, and afterward joined by Driggers, at the time these utterances were made.   Under no other theory could this evidence have been admitted.   The rule is as well established as any other that, after a conspiracy has once been formed, whether to bring about and effect the purpose finally accomplished or not, evidence of acts and expressions of one of the co-conspirators is admissible against the others, whether the conspirator against whom it is introduced was present or

not. This, under the view taken by the authorities that, when a conspiracy is created, the parties so agreeing constitute a separate and distinct individuality, and that the act of one is the act of all, and that the expression of one is the expression of all made in pursuance of the conspiracy. Greenleaf on Evidence, vol. 3, § 94. When evidence is offered of an act or conversation of a party in his absence, who is charged with being a party to a conspiracy, the primary question to be determined is, whether or not the conspiracy had been formed at the time, or had the conspiracy ceased. If it had not been formed, or if it had ceased, then the act or statement is inadmissible. In the case of *People v. Kief*, 126 N. Y. 661, 27 N. E. 556, the rule is laid down in the following language:

"Where the guilt of one of several defendants, jointly indicted for a felony, is sought to be established by evidence showing, or tending to show, a conspiracy between him and the others for the commission of the crime, evidence as to acts or statements of the others must be confined to such statements as were made, or acts done, at times when the proofs in the case permit of a finding that a conspiracy existed, and where the acts or statements were in furtherance of the common design. The acts or statements of one of the defendants prior to the formation of the conspiracy, or subsequent to its termination by the accomplishment of the common purpose, or by abandonment, are inadmissible as evidence against the others."

The evidence of which complaint is made is the statement Goff made to Brady the day before the shooting, when Brady was on the land constructing a fence, when Goff said to him: "If you put any cattle in here I will kill you"—this being further connected with the offense by Goff's statement to Brady at the time of the shooting, when he said, with an oath: "I told you the other day that I would kill you." The evidence of the relationship between these parties is set out in the statement of facts, and we submit that under it there must be great doubt as to whether or not the conspiracy was formed at the time Goff used that language. It is true, if one had been formed, and Driggers joined it

afterwards, his joining it would be an adoption by him of the things done or said by the others in furtherance of the general plan formed prior to his joining it. *State v. May,* 142 Mo. 135, 43 S. W. 637. Whether there is any evidence of a conspiracy is primarily a question to the court. There must be some tangible material evidence of the conspiracy or a promise of its production, before a court can properly admit evidence of statements made in the absence of the party against whom they are used, when he, in fact, was not present, and knew nothing of them. This evidence need not be direct and positive or conclusive, in fact, but there should be some, and it is for the court to say, in the first instance, whether or not it exists. This does not apply, of course, where it is sought to show, by the very language itself, that it was a part of the formation of the conspiracy. Goff testified that he had rented this place for the year 1903, and that he was entitled to the possession of it. There is nothing in the record to show that at the time Brady started to run his cross-fence over this land, either Goff or Driggers or Tom McCarter or any of the other parties had any prior information that such was his intention. The fence was well under way when Goff discovered it, and, going over where the work was going on, forbade continuance of it. He then left and returned, Tom McCarter accompanying him. There is no evidence from either McCarter or Goff or from any other source, as to why they went back, or what their purpose was. Goff again continued the conversation that he had begun before. McCarter said nothing, taking no part in the conversation, nor doing any act which would show that there was any concert of action whatever between them or of any formation of a conspiracy. He was simply present. He said nothing. He did nothing. Certainly Goff could not form a conspiracy with himself. It might be asked why McCarter went over there with Goff, what his purpose was, if it were not the beginning of a conspiracy? We cannot say what his purpose was. We do not know. There is no evidence in the record to show. He was living on the place. It be-

longed to his mother-in-law, and this, in our judgment, is clearly as strong and pertinent a reason as the one ascribed to it by the district attorney, and is more in consonance with the strict policy of the law, which presumes innocence and not guilt. It is true that immediately after this took place, Goff went to Driggers' house. McCarter immediately began to take action to get ammunition and a gun, and that as soon as Driggers returned home, and on being informed of the circumstances, he likewise began to make preparations for the affray, but to us it seems more reasonable to conclude from the evidence that these acts were simply carrying out the purpose of the threat made by Goff, and the intent then formed, than was the threat part of a conspiracy formed prior to its being spoken. There is evidence of the conspiracy being formed immediately afterward. We cannot find any evidence that it was formed before. Hence we hold that this admission of the statement of Goff to Brady in the absence of Driggers was prior to any conspiracy formed and, it not being shown that he consented or assented thereto, was erroneous.

The fourth assignment of error raises the question of the admissibility of the evidence of Rhea, which was offered to support the testimony given by Kelley when it was sought to impeach him by Boatright, who testified, in reference to the statements made by Kelley, contrary to those which he had given upon the witness stand. In view of the contrariety of opinion existing among the text-writers and judicial expressions of the courts of the United States, and in view of the further fact that this question is a new one in this jurisdiction, have combined to impel us to give it a more extended examination than we otherwise should. It is the contention of the defendant that this was prejudicial error, and he cites a number of authorities to sustain his position. The theory adopted by some of the states in admitting this testimony is that, the credibility of a witness being impeached or assailed by proof of contrary statements made out of court, the witness may support his evidence, and his credibility is sustained by showing

his consistent statements, made at or about the time when it is alleged the prior inconsistent statement was made; and some of the courts, unreservedly and without qualification, adhere to the doctrine that this evidence is admissible. Others hold that it is admissible under any circumstances, while others, with another line of authorities, and in our judgment by far the greater weight and number, hold that where it is attempted to be shown that the statement on the stand is a late fabrication, brought about by the changed situation of the witness to the case or the parties to it, or because of a motive recently formed, then the evidence of prior statements, consistent with those made on the stand under oath, is properly admitted. The states which hold broadly and without qualification that such evidence is admissible appear to be the following: Texas, North Carolina, Missouri, and Indiana. The decisions of the courts of these states, which we have examined, and in which it is so held, are as follows: *Jones v. State,* 38 Tex. Cr. R. 87, 40 S. W. 807, 41 S. W. 638, 70 Am. St. Rep. 719; *Easterwood v. State,* 34 Tex. Cr. R. 400, 31 S. W. 294; *Lee v. State,* 44 Tex. Cr. R. 460, 72 S. W. 195; *State v. Exum,* 138 N. C. 599, 50 S. E. 283; *State v. Grant,* 79 Mo. 113, 49 Am. Rep. 218; *Hicks v. State,* 165 Ind. 440, 75 N. E. 641. The rule generally adopted in those states is expressed by the Supreme Court of Indiana, in the case of *Hicks v. State, supra,* in the following language:

"Where a witness is impeached by evidence of contradictory statements, he may be supported by corroborating statements made at about the same time as the alleged contradictory statements."

On the other hand, the following states seem to hold squarely against the admissibility of such testimony under any circumstances: Mississippi, Maine, Iowa, Georgia, Colorado, and Alabama. The cases decided by these courts, which sustain this doctrine, and which we have examined, are as follows: *Head v. State,* 44 Miss. 731; *Ware v. Ware,* 8 Me. 42 (this was a case decided in 1834, and our researches do not disclose that the rule has been changed); *State v. Porter,* 74 Iowa, 623, 38 N. W. 514; *Cook*

*v. State*, 124 Ga. 653, 53 S. E. 104 (but, in this connection, see the case of *Sweeney v. Sweeney*, 121 Ga. 293, 48 S. E. 984) ; *Davis v. Graham*, 2 Colo. App. 210, 29 Pac. 1007.   In this case it will be noted, however, that there is a limitation placed upon the rule, which is that statements, made after the alleged contradictory matter, are not admissible.  *Sonneborn v. Bernstein*, 49 Ala. 168. This case expresses the earlier doctrine of Alabama, and went to the extraordinary extent of holding that where a witness was impeached, not by proof of contradictory statements made by him, but by a showing that his general character for truth was bad, even under these conditions he may be supported, or his testimony may be corroborated by showing that, prior to the commencement of the action he made statements out of court, uniform and consistent with his testimony in court.   This doctrine, however, was directly overruled, and the case went with it, in *McKelton v. State,* 86 Ala. 594, 6 South. 301, in which the court said:

"A witness having been impeached by proof of contradictory statements made by him on the preliminary examination of the defendant before a committing magistrate, it is not permissible to sustain or corroborate him by proving that, just before his examination as a witness on that occasion, he made statements to the magistrate in substance the same as his testimony on the trial."

The view entertained on this question in that state is further complicated by the holding in the case of *Nichols v. Stewart,* 20 Ala. 358:  "Proof of declarations, verbal or written, made by a witness out of court, is, as a general rule, inadmissible in corroboration of testimony given by him on the trial of a cause"— this case being one in which the testimony of a witness was contradicted by showing contrary statements out of court but it was allowed to be corroborated by evidence of prior consistent declarations.   These different divergent opinions, cited from the Alabama court, arc given to show how mixed some of the courts are on the proposition, but Alabama is not alone.   Other states have made holdings practically as conflicting.   The rule generally adopted in

the above states is expressed by the Supreme Court of Mississippi in the case of *Head v. State, supra,* in the following language:

"To discredit a witness it is competent that he had made discordant statements at other times and places; but to re-establish his credibility, or to support what he has deposed on the trial, it is inadmissible to prove that he has made the same statements to third persons."

We now come to a consideration of the authorities which aver the rule so well expressed by the Tennessee Supreme Court in the case of *Legere v State,* 111 Tenn. 368, 77 S. W. 1059, 102 Am. St. 781, that we adopt its language for our expression of the same:

."It is a general rule that where evidence of contradictory statements is offered to impeach the credit of a witness, evidence of statements made by him on former occasions, consistent with his evidence, are inadmissible. But where it is charged that the evidence of the witness is a recent fabrication, and is the result of some relation to the party or cause, or of some motive or personal interest, his evidence may be supported by showing that he had made a similar statement before that relation or motive existed."

Arrayed in support of the doctrine declared by the court will be found the Supreme Court of the United States, Arkansas, California, Kansas, Illinois, Louisiana, Michigan, Massachusetts, New Hampshire, New York, Pennsylvania, South Carolina, South Dakota, Tennessee, Vermont, and Washington. The cases examined, in which the appellate tribunals of the United States and the states named have adhered to the rule last declared are as follows: *Ellicott and Meredith v. Pearl,* 10 Pet. 412, 9 L. Ed. 475. Arkansas: *Burks v. State,* 78 Ark. 271, 93 S. W. 983. California: *Barkly v. Copeland,* 74 Cal. 1, 15 Pac. 307, 5 Am. St. Rep. 413; *People v. Turner,* 1 Cal. App. 420, 82 Pac. 397. Illinois: *Chicago Railway Co. v. Matthieson,* 212 Ill. 292, 72 N. E. 443; *Id.,* 113 Ill. App. 246. Kansas: *County Commissioners v. Vickers,* 62 Kan. 25, 61 Pac. 391; *State v. Petty,* 21 Kan. 54; *State v. Hendricks,* 32 Kan. 559, 4 Pac. 1050. Louisiana: *State*

*v. Waggoner*, 39 La. Ann. 919, 3 South. 119.   Michigan: *Stewart v. People*, 23 Mich. 63, 9 Am. Rep. 78.   Massachusetts: *Commonwealth v. Jenkins*, 10 Gray, 485.   New Hampshire: *Reed v. Spaulding*, 42 N. H. 114.   New York: *Robb v. Hackley & Welton*, 23 Wend. 50.   North Carolina: *Wallace v. Grizzard*, 114 N. C. 488, 19 S. E. 760.   Pennsylvania: *Commonwealth v Brown*, 23 Pa. Super Ct. 470; *Crooks v. Bunn*, 136 Pa. 368, 20 Atl. 529. South Carolina: *State v. McDaniel*, 68 S. C. 304, 47 S. E. 384, 102 Am. St. Rep 661.   South Dakota: *State v. Caddy*, 15 S. D. 167, 87 N. W. 927, 91 Am. St. Rep. 666.   Tennessee: *Glass v. Bennett*, 89 Tenn. 478, 14 S. W. 1085.   Vermont: *State v. Flint*, 60 Vt. 304, 14 Atl. 178.   Washington: *State v. Coats*, 22 Wash. 601, 61 Pac. 726.   From the foregoing collaboration on the proposition involved it will be readily seen on which side of the balance the great weight of judicial expression rests.   We, therefore, declare the doctrine of this jurisdiction to be as annunciated by the Supreme Court of Tennessee above quoted, which may be epitomized by saying that such evidence is not admissible to support an impeached witness, except in those cases where not only his veracity is attacked, but his motive is also impugned.   This being so, we will now consider the evidence to which objection is urged.

The learned Mr. Justice Clayton, speaking for the court in his decision in this case states: "We think the court erred in admitting the evidence of Rhea.   But was this prejudicial error?" He then urges that it was not in the following language:

"The point in controversy was:   Did the deceased at the time he was shot lay his hand on the post?   And, if Kelley's testimony was contradicted, it was only on this point.   We have already pointed out that the tearing down of the fence under the circumstances was not a felony, and that act did not justify defendant in shooting and killing Brady; and, therefore, if he were killed because of that, it was murder, and if he were not killed because of that, it was immaterial."

We clearly appreciate the force of the argument presented,

but to our mind the error which was committed was not so much in reference to the substantive facts to which the evidence related, as it was to the effect which it had upon the testimony of both Kelley and the defendant. The portion of the opinion quoted, relating to the tearing down of the fence, and that this act did not justify defendant in shooting and killing Brady, calls for reference to the terms of the Annotated Statutes of 1899 of Indian Territory, relating to justifiable homicide. Paragraph 890 is as follows:

"Justifiable homicide is the killing of a human being in necessary self-defense, or in defense of habitation, person or property, against one who manifestly intends or endeavors, by violence or surprise, to commit a known felony."

And paragraph 1008 of the Annotated Statutes of 1899 of Indian Territory, which provides:

"If any person shall willfully or maliciously burn or otherwise destroy any rail or plank fence, or other inclosure,   *   *   *   shall be deemed guilty of a felony."

And it being made to appear by the evidence of defendant that, at the immediate time of the homicide or the shooting, Brady was in the act of pulling out or tearing down the fence, and that if his acts brought him within the purview of the statute last cited, this in itself appeared to be a justification for defendant's action. The decision holds, and we think correctly, that they did not constitute a felony, and hence was no defense to defendant, even though he were relying upon it. The deceased carried his revolver in a scabbard under his arm inside of his shirt, which was open in the front, and in addition thereto, had a slit in it. His revolver was found partially drawn from its receptacle, when he was examined, immediately after his death, as he lay upon the ground where he fell. It was the contention of Driggers that the deceased was engaged in drawing his revolver and throwing down the fence at the immediate time the shooting began, and that he did not shoot until he saw the revolver partially drawn and in the hand of Brady. Kelley was the government's principal wit-

ness.   He had been an officer in that country holding commission.from the United States marshal's office.   Driggers testified that he and Kelley were enemies, and there was outside evidence tending to support him.   Kelley and the defendant were the principal witnesses in this case as to what took place at the immediate instant of the shooting.   They both claim to know, and they alone testify on that point although there was other evidence tending to sustain the government in its contention that, when Brady got off of his horse, he was engaged in fixing his saddle and blanket and did not have hold of the fence at the time the shooting began. Driggers was entitled to no more than the law gave him, but he was on trial for his life, and was entitled to all that the law gave him.   If, as we have seen, from the authorities cited, a witness, contradicted or impeached by proof showing or tending to show that he has made statements out of court contrary to his evidence in court, may be supported under those conditions only where the party producing the impeaching evidence charges that the testimony of the witness is a recent fabrication, due to a late altered relationship to the parties or the cause or of some new motive, then if these conditions did not exist, Rhea should not have been permitted to have sustained Kelley, and in view of the fact that there is no evidence charging these things, or tending to show that his attitude toward the cause or the parties was in any wise altered, it was improper to admit this evidence; and while we agree with Justice Clayton that it was error, we cannot say it was not prejudicial.   If it was not lawful to sustain Kelly in this matter, Driggers was entitled to be relieved of the support given the adverse witness' evidence, and of the imputation which such support cast upon his own.   If the jury believed that Kelley was telling the truth when he stated that Brady did not have hold of the post, they necessarily believed that the defendant was guilty of falsehood.   If they believed that Kelley told the truth, and that Driggers falsified, in reference to the fact mentioned, which occurred contemporaneously with the shooting there can be no question that they would, at the same time and with good reason, come to

the conclusion that Kelley also told the truth in reference to the shooting, and that here again Driggers was falsifying. It was this effect which the evidence in support of Kelley had, which to us appears to have constituted its chief prejudicial effect, rather than of the mere conflict in the evidence as to whether Brady did or did not take hold of the fence.

Was the evidence of Jim Saddler admissible? It will be observed that Saddler's evidence was taken before the United States Commissioner. He was not present at the trial of this cause, and his evidence as transcribed was admitted and read to the jury, over the objection of defendant, upon proof of the officer's return, on the subpœna issued for him, showing that he was dead; and also it appears by the testimony of other witnesses that they had been told that he was dead. The question now presents itself, taking into consideration the duty of the court in the admission of evidence under circumstances of this character, was this proof of legal sufficiency as a foundation for secondary evidence? Paragraph 1995 of the statutes of Indian Territory provides:

"A subpœna may be served by the sheriff, coroner or any constable of the county whose return thereof shall be proof of the service."

Encyclopedia of Pleading & Practice, under the title "Returns" (volume 18, p. 963), states:

"An official return is the best evidence of the doings of the officer under the mandates of the writ or process, and is sufficient as proof of the facts which the officer is authorized and required to certify."

The question then arises, was the marshal in this case authorized and required to certify to the death of the witness, to secure whose attendance he endeavored to serve the subpœna? Was this the return authorized by the statute? This question is answered by the Supreme Court of the United States in the case of *Walden v. Craig,* 14 Pet. 147, 10 L. Ed. 393, wherein Mr. Justice McLean, who delivered the opinion of the court says:

"It is admitted that the marshal's return of service, or non-

service, which he indorses on the process, and of which he has official knowledge, becomes matter of record, and is binding on the parties. But the marshal can only know, in common with other citizens, of the decease of a person named in the writ; and if he indorse the fact of such decease, though it may be spread on the record, it is clearly not binding on the parties. Shall a rumor which shall, in the opinion of the marshal, justify such indorsement make the fact a matter of record? It may excuse the officer, but it does not bind the party whose rights are involved."

The officer in the case at bar may have known, in common with the other citizens, of the decease of the witness Saddler; but his return thereof on the subpœna not being authorized and required by law, was clearly not binding on the defendant. When he went beyond the statutory requirements and certified to a fact not made by law a part of his official duty, such certificate or such statement then contained no greater evidentiary or probative force than if made by any other person, one not an officer. *Obermier v. Core,* 25 Ark. 562. This being true, the question then arises, what force was the evidence of the other parties called and examined, who testified that they had been told that Saddler was dead?

We have examined a number of authorities on this proposition, and as usual, on close questions of this kind, there is contrariety of opinion among the courts. Alabama (*Burton v. State,* 107 Ala. 68, 18 South. 240), Michigan (*Wheeler v. Jenison,* 120 Mich. 422, 79 N. W. 643), and Iowa (*Spaulding v. Railway Co.,* 98 Iowa, 205, 67 N. W. 227) hold that the matter is addressed to the sound discretion of the court, and that hearsay evidence is admissible to prove the absence of a witness from the jurisdiction, and sufficient to sustain the admissibility of secondary evidence. While this is true in the cases cited, in Alabama and Iowa the same courts have also held to the contrary on the same proposition. For instance, a later case in Alabama (*Mitchell v. State,* 114 Ala. 1, 22 South. 71) holds:

"Where an officer, who had for execution the subpœna for an absent witness, and had returned it 'not found,' testifies that he had hunted for the witness, and she could not be found in

the county, but he did not know that she had left the state, he cannot, for the purpose of laying a predicate for the introduction of evidence of the testimony of such absent witness given on the preliminary trial, further testify as to what was the report in the neighborhood where the witness lived as to her whereabouts, or that it was the general report in her neighborhood that she had gone out of the state; such evidence being merely hearsay and inadmissible."

In an earlier case in Iowa (*Baldwin v. Railway Co.*, 68 Iowa, 37, 25 N. W. 918) the court holds:

"Under the provisions of section 3777 of the Code the shorthand reporter's notes of the testimony of a witness cannot be used on the trial of another cause, without first showing, as in the case of the use of a deposition, that the witness himself cannot be produced in court; and evidence that the witness was *reputed* to have left the state was not sufficient for the purpose."

The fact relied upon was the death of Saddler, and it was sought to prove it by showing hearsay statements that he was dead. No facts stated before the court established Saddler's death. All that anything in the evidence proved was that the parties who testified had been informed by others that this was a fact. This was unquestionably unalloyed hearsay, and was inadmissible to prove the fact; and as a fact it must be proved to admit the evidence. Hearsay evidence is admissible in many instances, but where it is sought to introduce the evidence of a witness taken on a prior trial, based on the fact of his death, this death must be shown as a fact. And the court, in overruling the objection of defendant to the introduction of Saddler's testimony, committed error. All that these witnesses testified to could have been true, and Saddler may not only have been alive, but actually within the jurisdiction of the court. If he was, he should have been produced in person. If he was not, this should have been proven as other facts, by the testimony of some one who knew it.

The defendant took formal exception to but one instruction given by the court. This was the instruction relating to the law of mutual combat, but he offered to the court, and requested that

they be given to the jury as the law of the case, six instructions which, with the exception of No. 2, related generally to rights which he claimed, growing out of his possession of the field over which the controversy arose. All of these were refused, and defendant urges error therefor. Instruction No. 2, which he offered, relates to the instruction in reference to Tom McCarter, who was one of the defendants jointly indicted with Driggers. Justice Clayton, speaking for the Court of Appeals in the decision heretofore rendered in this case, so accurately states the law applicable that we adopt that portion of the opinion as ours, and agree with that court that there was no error in refusing this instruction in view of the one given. His language is as follows:

"The eighth assignment of error complains of the charge of the court relating to the necessity for corroborating testimony of an accomplice before conviction can be had. The defendant requested the following instruction: 'You are instructed that Tom McCarter, the witness introduced by the government, is an accomplice in the offense charged against the defendant, and a conviction cannot be had upon his testimony, unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and the corroboration is not sufficient if it merely shows that an offense was committed, and the circumstances thereof.' The charge of the court was as follows: 'Under the laws of Arkansas (section 1602, Ind. T. Ann. St. 1899) it is provided as follows: "A conviction cannot be had in any case of felony upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof."' An exception was saved to the refusal of the court to give the requested instruction, but none saved as to the charge given. The only difference between them is that in the requested instruction the court is asked to charge the jury that Tom McCarter was an accomplice, while the instruction given left that question to the jury. Whether McCarter was an accomplice or not was a question of fact, to be determined by the jury. 'The court is not required to affirmatively charge that a witness is an accomplice. Where he is admitted to be such, or the facts place this beyond dispute, the court may so charge, without invading the rule

that charges should not be upon the weight of the evidence. Whether or not a witness is an accomplice is a question of fact, and the charge may be so framed as to submit this as an issue to the jury. It was not necessary, in this case, to instruct the jury that Anderson was an accomplice.' (*Dill v. State* [Tex. Cr. App.] 28 S. W. 950.) 'It is urged that it was plain from the testimony of the witness Kelley that he was an accomplice of the defendant, if defendant committed the crime alleged, and the court should have so instructed the jury; but the court fully and carefully instructed as to the weight and effect of the testimony of an accomplice, and to have gone further and told them that Kelley was an accomplice would have been clearly a charge with respect to matters of fact, which is not allowed.' (*People v. Sansome,* 98 Cal. 235, 33 Pac. 204.) See, also, *Spears v. State,* 24 Tex. App. 537, 7 S. W. 245. If the plaintiff in error regarded the word 'accomplice' as a technical, legal one, requiring, at the hands of the court, a definition, he should have requested it, and not by asking a declaration on the part of the court that McCarter was an accomplice, for this would be a finding of fact from the proof. And this was the effect of the requested instruction. 'While in one sense it is undoubtedly the duty of the judge to give instructions to the jury covering the entire law of the case, as respects all the facts proved, or claimed by the respective counsel to be proved, still, if he omits something, and is not asked to supply the defect, the party who remained voluntarily silent cannot complain.' (1 Bishop, Cr. Proc. § 98; *Carroll v. State,* 45 Ark. 548.) The court followed the language of the statute, and in this case it was amply sufficient, and there was no error in refusing the requested instruction."

In reference to the right which Driggers had, claiming, as he did, the possession and the right of possession of the field under contest, he requested the court to give the following instruction:

"If the jury find from the evidence that the defendant Driggers had rented the stock field, referred to in the testimony, from Goff and Riley, and was in possession of the same, then the deceased would not have the lawful right to eject the defendant therefrom by force of arms. And if you further find from the evidence that the deceased attempted to take the possession of said stock field from the defendant Driggers with force of arms under such circumstances as reasonably indicated to defendant that it was the purpose of the deceased to use deadly weapons in

obtaining possession of said stock field, then defendant Driggers had the legal right to meet force with force, and if the deceased by any act then done manifested an intention to kill defendant Driggers or to inflict serious bodily injury upon him, then the defendant had the legal right to kill the deceased; and if you so find, you will acquit the defendant. If the jury believes from the evidence that defendant Driggers was in his own field and on his own premises, and that he was advised that the deceased had threatened to take possession of his property by force, and in good faith believed, as a reasonable man, that deceased intended to kill him or do him great bodily injury in order to get possession of the field, and whilst so in his own field deceased came there and undertook to enter the field by tearing down the fence, and in a violent threatening manner reached for his pistol, and with said pistol partly drawn in a threatening manner undertook to enter the field where defendant was, and that defendant believed, as a reasonable man, that deceased intended to kill him or do him great bodily injury, and acting under the influence of said belief, whilst deceased was so endeavoring to enter the field, defendant killed him (deceased), the killing would be justifiable."

We believe from a reading and careful consideration of these instructions that they correctly state the law in reference to the right Driggers had in the premises and his right of defense in resisting the efforts of Brady to secure or to take possession of the land. These being correct, the question now arises, did the court give these instructions to the jury, or did the charge which he gave contain substantially the same matter? The court's instructions on this subject are as follows:

"You are instructed that a man may use force to defend his real or personal property, in his actual possession, against one who endeavors to dispossess him without right, taking care that the force used does not exceed what reasonably appears to be necessary for the purpose of defense and prevention. But in the absence of an attempt to commit a felony, he cannot defend his property, except his habitation, to the extent of killing the aggressor for the purpose of preventing a trespass; and if he should do so, he would be guilty of a felonious homicide. Life is too valuable to be sacrificed solely for the protection of property. Rather than slay the aggressor to prevent a mere trespass, when

no felony is attempted, he should yield, and appeal to the courts for redress. You are instructed that, although you may believe from the evidence that the deceased had rented the lands in controversy, and was entitled to the possession thereof, still he was not justified in driving his cattle thereon, or taking possession of the land by force, if the same was in the actual possession of the defendant. But the court would instruct you that an attempt of the deceased to drive his cattle on the premises would not of itself be a felony. If you believe from the evidence beyond a reasonable doubt that the defendant, either by himself, or acting with others, armed himself, and had others with him who were armed, for the purpose of going to the stock field in question and preventing the deceased from driving the cattle into said stock field, and that his purpose in being so armed was to prevent an entry into said stock field on the part of the deceased with said cattle, and if you further believe that it was his purpose and intention in being thus armed and present at said place to make an assault upon and kill the deceased, or otherwise attempt to injure him with a deadly weapon, if the deceased attempted to drive said cattle into said stock field, and in pursuance of said purpose he did shoot at and others acting with him did shoot and kill the deceased, then in such case such act upon the part of the defendant, if the deceased was thereby killed, is murder, although you may believe that the deceased was fired upon and his death ensued thereafter by reason of the fact that he may have attempted to pull down the fence for the purpose of entering the said cattle."

It will be observed that the instructions given by the court were probably predicated upon the testimony which Kelley gave concerning the threat made by Goff on the day previous, to the effect that if Brady put the cattle into the field, he would kill him; either this, or upon the facts which developed between the time this threat was made and the affray. If upon the former, then it was incorrect, as the evidence we have found was incompetent; and if upon the latter, it seems to us that it scarcely takes into consideration, to the extent to which defendant was entitled, his evidence given as to why he went to the field, and the contention made in reference to his claim of right there. His claim being, as stated by his counsel in his brief, that "he was on

his own premises, trying to protect his own property against the wrongful trespass of the deceased, and while so protesting, and while making no effort to kill the deceased, the deceased assaulted him with a deadly weapon," and that the homicide took place, not by reason of the attempted trespass on the property, destruction of the fence, nor the turning in of the cattle on it by deceased, but because of the alleged attempt of deceased to draw his revolver and inflict death or great bodily harm upon the defendant. The instructions given by the court present the theory of the prosecution, and state the law in relation thereto without error; but the defendant was entitled to have the law declared in reference to the facts which he contended the evidence reasonably tended to show, and if there was any evidence in the record upon which the instructions offered could properly be predicated, they should have been given.

The instruction asked and refused stated that:

"Driggers had the legal right to meet force with force, and if the deceased by any act then done manifested any intention to kill defendant Driggers, or to inflict serious bodily injury upon him, then the defendant had the legal right to kill the deceased; and if you so find you will acquit the defendant."

And, further, that if, while defendant was peaceably in his own field, "the deceased came there and undertook to enter the field by tearing down the fence, and in a violent threatening manner reached for his pistol, and with said pistol partly drawn in a threatening manner undertook to enter the field where defendant was, and that defendant believed, as a reasonable man, that deceased intended to kill him or do him great bodily injury, and, acting under the influence of said belief, whilst deceased was so endeavoring to enter the field, defendant killed him (deceased), the killing would be justifiable." We believe this instruction, taken in conjunction with the elaborate and correct statement of the law of self-defense, correctly stated the rule, which defendant was entitled to have declared.

As above stated, exception was reserved to but one instruction, given by the court, which was one on mutual combat, and is as follows:

"If you should believe from the evidence that the defendant B F. Driggers was informed and believed that the deceased and one Tom Kelley had taken possession of a certain stock field the day previous to the killing, which stock field was also claimed by the defendant, and the defendant was informed and believed that the said Kelley and the deceased, or either of them, would be at the field in question on the morning of the killing, and that the man Kelley or the deceased had made threats against the life of this defendant, and that the defendant believed that Kelley and the deceased and others would be at the field in question, having in their possession deadly weapons, as mentioned heretofore, and you further believe that the defendant, knowing all these things, voluntarily organized or assisted in organizing a company of men, arming himself and such men with deadly weapons, guns, and revolvers loaded, and that such preparation was for the purpose of meeting the said Kelley and the said deceased in deadly conflict, and that the defendant proceeded to the place of the killing with said company and with said arms, and that at such time and place a conflict ensued with deadly weapons, and the deceased was killed, and the defendant participated in the shooting, then such conflict would be what is known in law as a 'mutual combat.' And if in such combat a party is killed, all parties, who knowingly and intentionally engaged in the conflict, are guilty of murder."

After the jury had retired and had been out about 20 hours, it returned back into the court, and presented to the court, the following question: "Your honor, does the charge of what is known as 'mutual combat' cut out the right of self-defense?". The court, in answer to this inquiry, added to the instruction above quoted, after the words "guilty of murder," the following language. "And cannot claim the right of self-defense if you can so find."

This instruction was predicated upon the contention of the prosecution in this case. The expression "mutual combat" about as clearly conveys the meaning of what is required to constitute it as any definition could. It means, in different language, though probably not more clear, an agreement or meeting of minds be-

tween two parties to fight, whether with or without arms. It means a coming together, with a mutually understood purpose for a violent contest. The government took the position that the evidence in this case established that Driggers and his party knew that Brady and his party were coming to the field armed, for the purpose of driving cattle in on this field and taking possession thereof at all hazzards. That they knew, or had reasonable ground to believe, that Driggers and his party would be armed, with the purpose and intention, as declared to Brady by Goff on the day before, of killing him if they carried out this purpose. That Driggers and Goff gathered together men, arms, and ammunition for the purpose of using them in preventing these things on the part of Brady, thereby, through these acts, creating the agreement to fight, and in view of this claim which, it must be conceded, may be said to find reasonable support in the evidence, in our judgment the instruction given was not erroneous.

Counsel for defendant in their briefs inveigh against it most vigorously, denominating it "a fiery and fierce resume of the most strained construction of the evidence against the plaintiff in error, with many exaggerations to his detriment, which suggests many conclusions and deductions of which the evidence is wholly incapable." While it is true the instruction improperly includes a revolver with the other weapons which defendant's party had, yet it will be noted that this instruction in fact assumes nothing as proved or as true, but places upon the prosecution the very highest possible burden of proof in the case. It does not assume, as is asserted, that Brady had possession of the field, but requires the jury to find from the evidence that Driggers was informed and believed that Brady had taken possession of the field, and requires proof that defendant was informed and believed that Kelley and the deceased would be at the field in question on the morning of the killing, having in their possession deadly weapons, and further requiring the jury to find and believe that defendant, *knowing* of these things, voluntarily organized a company of men, and

armed them *"for the purpose* of meeting said Kelley and the said deceased in deadly conflict." If this fact was not proved by the evidence, then the law of mutual combat did not apply, and the instruction fell with it. But to find this the jury were compelled to find against all of the evidence given by defendant on this point, and to find that the extreme contention of the prosecution was true. We do not see that the defendant could complain of this.

This instruction placed a heavy burden upon the prosecution, and to our mind in fact, instead of being adverse to the defendant, was really favorable to him. Of course, in passing on this instruction we do not presume to say that the evidence in this case established mutual combat. All that we hold is that there was evidence in the case sufficient, under the claims of the prosecution upon which to predicate this instruction, and under it the government was entitled to have the law relating thereto declared. It is strenuously urged that it should have contained a saving clause, providing for the contingency of defendant's withdrawal from the coming fray. There is no question on the law on the subject, for the defendant, even though he went to the field for the purpose of engaging in a mutual combat, if he, in good faith, withdrew, and sought to avoid the difficulty before the fatal moment, and if, while in this attitude, the deceased himself brought about, by his acts, a condition wherein the life of defendant was endangered, or where he in good faith believed it was, then the right of self-defense would exist in him, and he would have the right to defend his life as against the deceased, notwithstanding his previous intentions to engage in a combat. But did he withdraw? Counsel urge and insist that, when defendant sent word to Brady not to come there, he could not turn the cattle in; that this amounted to a withdrawal. We cannot consent to this. It seems to us that it was an effort, or an invitation at least, to induce Brady and his party to withdraw, not a withdrawal of Driggers. He remained where he was, with his gun and his party, and awaited the arrival

88          SUPREME COURT OF OKLAHOMA.

of the deceased, who, with his party, came on, and the conflict ensued.

We believe we have now covered practically all of the propositions urged in this court which will be likely to again arise in a new trial hereof, and we believe that a trial, conducted along the lines and within the limitation herein prescribed, will safeguard the rights of both the state and the defendant. The decision is accordingly reversed, and the case remanded to the district court of Garvin county, with instructions to grant the defendant a new trial.

Hayes, Kane, and Turner, JJ., concur; Williams, C. J. disqualified.