## HARRY WEATHERHOLT v. STATE.

No. A-1488.   Opinion Filed April 5, 1913.

(131 Pac., 185.)

1. **TRIAL—Withdrawal of Plea—Discretion of Court.** A motion to quash and set aside an information should be made before plea, and an application for leave to withdraw a plea of "not guilty" for the purpose of moving to quash and set aside the information is addressed to the sound discretion of the court.

2. **INDICTMENT AND INFORMATION—Variance from Complaint.** The complaint before the committing magistrate averred that the killing was effected by means of a shotgun; and the information in the district court averred that the killing was effected by means of a Winchester rifle. Held, that this is a sufficient compliance with the constitutional provision (art. 2, sec. 17, Bill of Rights) as the means by which the offense was committed are not a constituent element of the crime of murder, and that the variance between the averments of the original complaint and the information filed in the district court are not to the prejudice of the substantial rights of the defendant.

3. **TRIAL—Arraignment and Plea—Withdrawal of Plea.** Where the motion to quash and set aside is not made in good faith, and is obviously without merit, and it is evident that substantial justice will not be promoted, nor rights of the defendant prejudiced, an application for leave to withdraw a plea of not guilty for the purpose of presenting such motion was properly denied.

4. **TRIAL—Separation of Jury.** Section 6851, Comp. Laws 1909 providing that "the jurors sworn to try an indictment may at any time before the submission of the cause to the jury, in the discretion of the court, be permitted to separate, or to be kept in the charge of proper officers," leaves the question of keeping the jury together during the trial of a capital case within the discretion of the trial court. The fact that a juror in a capital case became separated from his fellow jurors at a recess during the trial, and left the custody of the officers who had the jury in charge, is not sufficient ground to grant a new trial; where it does not appear that he had any communication with any one concerning the cause, either directly by conversation, or indirectly, by overhearing the observations of others, or that he did any act inconsistent with his duty as a juror during such separation.

5. **JURY—Separation—Presumption of Prejudice.** When the jury have separated without leave of the court after retiring to deliberate

Vol. 9 Cr.—11

on their verdict, and before delivering or sealing the same if it be sealed, in violation of section 6896, Comp. Laws (Rev. Laws, 5937), prejudice will be presumed, and the burden of proof is on the prosecution to affirmatively show that the defendant was not prejudiced thereby.

6. HOMICIDE—Mutual Combat. Where the killing was done in mutual combat entered into willingly and in the knowledge of its liability to cause death to one or more of the combatants, all parties who knowingly and intentionally engage in such mutual combat are guilty of murder or first-degree manslaughter, unless it be shown that before the fatal shot was fired they had refused any further combat, and had in good faith withdrawn and sought to avoid further conflict, and that the killing was then done in necessary self-defense.

7. HOMICIDE—Principals. One who is present, aiding and abetting in a murder, is guilty as a principal, though another does the killing.

8. HOMICIDE—Appeal—Harmless Error. A defendant who has been convicted of manslaughter in the second degree cannot complain that the court charged the law of manslaughter in the second degree, and that the evidence did not justify such a charge.

(Syllabus by the Court.)

*Error from District Court, Ellis County;*
*G. A. Brown, Judge.*

Harry Weatherholt was convicted of manslaughter in the second degree, and brings error. Affirmed.

The plaintiff in error, hereinafter referred to as the defendant, was convicted of manslaughter in the second degree in the district court of Ellis county on an information filed in said court October 12, 1909, charging him with the murder of Thomas Morgan in said county on the 27th day of July, 1909, and was sentenced to imprisonment in the penitentiary for a term of three and one-half years. The judgment and sentence was entered October 14, 1911. To reverse the judgment, the defendant perfected an appeal by case-made.

The story of the homicide as told by the witnesses for the state is short and simple. The defendant and the deceased disagreed and had some difficulty over the line fence which separated the farms of the respective parties. The de-

fendant had removed the fence, and the deceased had moved it back. On the fatal day the cows of the deceased got through the fence and into the defendant's kafir corn. The deceased's daughter Elsie testified: That she drove the cows out of the cornfield, and E. F. Powers met her and told her to keep the cows out. She told him they would if they would let them keep the fence up; and he told her not to fix the fence and then went towards his house, and his son Ray, who was with him, went to Weatherholt's. That she had a hammer and some staples and commenced to fix the fence. That presently she saw Mr. Powers and his son and the defendant coming towards her, so she went home and told her folks about the cows being out, and asked her brothers to come and help her fix the fence; and Henry, Hiram, and Arnold said that they would go with her, and they and her father and sister Janette returned with her. That her oldest brother had a 22 pistol, the other two had shotguns, and her father had a 22 rifle. That they went along the fence and straightened it up and started to staple it. That the defendant, Mr. Weatherholt, and Mr. Powers and his son Ray were standing by an old hay stack. The defendant had a double-barrel shotgun, and the elder Powers had a Winchester rifle. That the three walked up to them, and her father said, "We are fixing the fence to keep the cattle out," and the defendant said, "Shut your mouth; your life is short." That they were all on her father's farm, and they went on fixing the fence. The defendant and Powers followed them. Overtaking them, her father told Powers that he wanted him to keep his dog off the cattle, and Powers said, "Shut your mouth," and fired at him and the defendant shot also about the same time. That the first shot that the defendant fired struck her father on the hand; and he fired a shot, and said, "That will do," and started home, when he was shot in the back, and died in a few minutes. That the second or third shot after her father fell struck her brother Henry in the back, and he died

before the doctor arrived. That all together four shots were fired by Powers and two by the defendant.

The testimony of Janette, Hiram, and Arnold Morgan was in substance the same as that of their sister Elsie.

The widow of the deceased testified: That she had seen the defendant walk along the fence with an old shotgun, and she felt uneasy when the children went to the fence, so, leaving her baby with her daughter Silva, she went about 40 rods from the house and looked, and saw the defendant and Powers following her husband and the children along the fence. That Powers fired the first shot and the defendant the second. Then the shooting became general. That she saw the defendant shoot again, and she went towards them and met her little girl, who said, "They have shot papa, and I think he is dead, and they shot Henry." That Mr. Powers seemed to have been shot, as his son and the defendant helped him as he went away.

Dr. G. E. Irvin testified: That he was a regular licensed and practicing physician located at Gage, and was called to the home of the deceased, Thomas Morgan, and examined the body. That the wound that caused the death was made by a bullet that had entered his back and passed through his body, and there was also a gunshot wound on the wrist.

The record shows the conviction of both the defendant and Powers for the killing of Henry Morgan at the time of the tragedy, and that they were each sentenced to serve a term of two years' imprisonment, and that after serving a short time the defendant Powers had been granted a parole.

For the defense E. F. Powers was the main witness. He testified: That he talked with Elsie Morgan on the fatal day about the stock trespassing, but did not tell her that he would not permit the fence to be fixed. That he sent his son Ray to tell the defendant that Morgan's stock had been in the crop and went home. That the defendant shortly after came to his home and asked him to go with him to estimate the

damage done by Morgan's stock, and he went with the defendant who had a double-barrel shotgun. That he carried his 44 Winchester rifle to shoot jack rabbits. They passed the Morgans near the line fence without stopping. Mr. Morgan made some remark, and the defendant said to Morgan that "he was not afraid of him," and Morgan answered "that we are ready for you right now," that the Morgans went west and they went east into the cornfield and examined the damage, and then took the back track and overtook the Morgans, and Mr. Morgan made some remark to witness about wanting him to keep his dog off the stock, and as he said this he and his son Henry raised their guns and fired, and witness was struck on the head with a rifle ball, knocking him down. That he raised up and shot at Mr. Morgan. That Arnold and Hiram Morgan shot at him, several shots hitting him on the head and shoulder. And witness shot again at Mr. Morgan, and then shot at Henry Morgan, who was shooting at him. That he had heard threats made against him and the defendant by Mr. Morgan, and had noticed that the Morgans often carried guns back and forth to their work. That he had been granted a pardon in the case of his conviction for killing Henry Morgan, and the case against him for the killing of Thomas Morgan had been dismissed.

Mrs. Powers, his wife, testified that she was watching the parties, and the first shot was fired from the Morgans' side of the fence.

Ray Powers testified that the Morgans fired the first shot and the defendant fired two shots.

Joe Bryan and his wife both testified that they witnessed the shooting, and the first two shots were from the Morgans' side of the fence.

Several witnesses testified that they heard the deceased threaten to shoot the defendant.

The defense was justification in self-defense. The defendant did not take the witness stand on his own behalf.

The foregoing statement of facts is sufficient for the purpose of this opinion.

*W. H. Springfield* and *C. B. Warren,* for plaintiff in error. *Chas. West,* Atty. Gen., *Smith C. Matson,* Asst. Atty. Gen.; and *Jos. L. Hull,* for the State.

DOYLE, J. (after stating the facts as above). A number of alleged errors in the trial of the case are assigned, which, in so far as they are deemed essential in reviewing the case, will be noted in the order of presentation. The first assignment is the usual one that the court erred in overruling the motion for new trial.

Second. The defendant claims that the court erred in overruling his application for leave to withdraw his plea of "not guilty," and permit him to file a motion to quash the information on the ground that there was a variance between the complaint and information, in that the former charged that the killing was effected by means of breech-loading shotgun, whereas the latter charged that it was by means of a Winchester rifle.

An application for leave to withdraw a plea of not guilty is addressed to the sound discretion of the court. The record shows that on August 18, 1909, the defendant was brought before the county judge, acting as a committing magistrate, and having waived a preliminary examination was held to answer for murder as charged before the district court; that on August 21, 1909, he was admitted to bail by the district judge; that on November 17, 1909, he was duly arraigned and entered a plea of "not guilty," and this application was not made until the case was called for trial April 6, 1911, about 18 months after the plea was entered.

In *Hunter v. State,* 3 Okla. Cr. 533, 107 Pac. 444, it is said:

"The facts stated, if true, in a motion to set aside an indictment, must present a case, not of technical, or possible, or hypothetical, but of manifest, prejudice to the substantial rights

of the defendant, and where it is plain that substantial justice will not be promoted, nor manifest wrong to the defendant prevented, the indictment should not be set aside on more technical errors, informalities, or irregularities."

The means with which the offense was committed are not a constituent element of the crime of murder, and while the averments of the means with which the offense charged was committed is a necessary averment to a good information, yet it cannot be said that the variance between the averments of the original complaint and the information filed in the district court was prejudicial to the substantial rights of the defendant. *Williams v. State,* 6 Okla. Cr. 373, 118 Pac. 1006; *Ponosky v. State,* 8 Okla. Cr. 116, 126 Pac. 451; *Tucker v. State,* 8 Okla. Cr. 428, 128 Pac. 313.

The defendant's plea of not guilty was advisedly entered, and we think the court did not exercise its discretion unsoundly in refusing to allow the defendant to withdraw his plea for the purpose of presenting a motion to quash the information that obviously was without merit.

Third. Error is assigned upon the rulings of the court in admitting and excluding testimony. Counsel in their brief state: "We do not wish to waive this assignment, but respectfully refer the reviewing court to the record." We do not consider it the duty of this court to examine the transcript of the evidence to determine whether or not the trial court erred in the admission or rejection of testimony and refer counsel to rule 4 prescribing that:

"When the error alleged is to the admission or to the rejection of evidence, the specification shall quote the full substance of the evidence admitted or rejected, stating specifically the objections thereto."

Fourth. The defendant complains of misconduct of the jury in separating without leave of the court, after having been sworn and placed in charge of the bailiff, and before the case had been finally submitted to them. One of the grounds of the motion for new trial is:

"That one of the jurymen, L. H. Oliver, separated from the rest of the jury and went alone to look after his team, and went to a restaurant separate and apart from the rest of the jurors to get his supper, and that the sheriff had to go after him and bring him back to the other jurors."

The fact of the separation of the jury as alleged is not denied. The bailiff testified that in taking the jury to supper the first day of the trial he missed the juror Oliver when they reached the hotel, and he went back, and found the juror at a restaurant, waiting for his supper; that he remonstrated with him, and the juror said that he was hard of hearing, and had understood the judge to say to be back at half past 7; that he had a team at the livery barn and had gone to see about that.

The juror Oliver testified that he talked with the judge in regard to getting leave to go and feed his team; that he went straight to the barn and fed his team, and then went to the restaurant where he was found by the sheriff; that he did not speak to any one, and no one spoke to him, and he did not hear any person speak about the case.

The record shows that, upon adjournment on the first day of the trial, the court instructed the bailiff to keep the jury together. This was on Thursday, October 5th; the case was submitted to the jury on October 7th. In support of this assignment, counsel cite the case of *Bilton v. Territory*, 1 Okla. Cr. 566, 99 Pac. 163. In the Bilton case the jury was permitted to separate after the case had been finally submitted and the jury had retired for the purpose of deliberating. It is not claimed in the case at bar that there was a separation of the jury after the case had been finally submitted to them.

Section 6851 (Comp. Laws 1909 [Rev. Laws, 5899]) Procedure Criminal, provides:

"The jurors sworn to try an indictment, may at any time before the submission of the cause to the jury, in the discretion of the court, be permitted to separate, or to be kept in charge of proper officers. The officers must be sworn to keep the jurors together until the next meeting of the court, to suffer no person to speak to or communicate with them, nor to do so them-

selves, on any subject connected with the trial, and to return them into court at the next meeting thereof."

Construing this section in the case of *Armstrong v. State*, 2 Okla. Cr. 567, 103 Pac. 658, 24 L. R. A. (N. S.) 776, it is said:

"Under this provision the segregation of the jury in felony cases, before the cause is finally submitted, is left in the discretion of the trial court, yet we believe that in the exercise of sound judicial discretion the trial court in a capital case should not refuse a request from either party to place the jury in charge of sworn officers during the progress of the trial. The legal presumption is that jurors perform their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact, that during the adjournments of a trial the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial, or that his substantial rights were prejudiced thereby."

And in conclusion it is said:

"The clear intention of the law-making power is that the mere separation of the jury during the numerous and necessary adjournments incidental to a criminal trial should not result in delaying or defeating the ends of justice, when there is not the slightest presumption or probability or even possibility of injustice to the defendant."

In a homicide case, where the court upon its own motion, after the jurors were sworn to try the case, ordered them into the custody of the sheriff during the progress of the trial, and before the final submission of the case certain of the jurors separated from the others, the Supreme Court of California said:

"The direction of the court did not give the defendant the right to control the action of the jury or of the officer in that respect during the pendency of the trial, nor the right to any exception for error or misconduct by reason of a failure to literally comply therewith. The mere fact that the direction of the court was violated does not give to the defendant the right to have the verdict set aside. He must show as fully as if the direction had not been given that one or more of the jurors was influenced in his verdict by some outside influence during

or in consequence of such separation." (*People v. Bemmerly,* 98 Cal. 299, 33 Pac. 263.)

See, also, *People v. Emmons,* 7 Cal. App. 685, 95 Pac. 1032.

This statute further provides (section 6858, Proc. Crim.) that, before the jury retire to deliberate on their verdict, one or more officers must be sworn to keep them together in some private and convenient place, and not to permit any person to speak to or communicate with them, nor do so themselves, unless it be by order of the court, and one of the express grounds for a new trial is:

"3d. When the jury have separated without leave of the court, after retiring to deliberate on their verdict, and before delivering, or sealing the same, if it be sealed." (Section 6896, Proc. Crim. [Rev. Laws, 6045].)

In *Goins v. State, ante,* 130 Pac. 513, and cases therein collated, it is held that on proof of a violation of this provision by permitting the jury to separate after the case is finally submitted the defendant is entitled to the presumption that such separation has been prejudicial to him, and the burden of proof is on the prosecution to show that no injury could have resulted therefrom to the defendant.

In the case at bar the burden of showing prejudice was upon the defendant; however, the prosecution assumed the burden by showing that the defendant was not prejudiced thereby, and that the separation was by permission of the court, and it clearly appears that the defendant suffered no injury by reason of such separation. It is also insisted that the verdict is contrary to law, and is not supported by sufficient evidence.

The only conflict between the law in the premises and the verdict of the jury is that there was no evidence tending to reduce the homicide to manslaughter in the second degree. However, the court for some reason not apparent from the record without objection by the defendant submitted to the jury the issue of manslaughter in the second degree. And the defendant cannot complain because the court gave the jury an op-

portunity to find him guilty of this degree, even though the evidence did not justify such an instruction.

As to the sufficiency of the evidence, one who is present aiding and abetting in a murder is guilty as a principal, though another does the killing. And if the defendant in any way challenged the fight, and went to it with an armed party on the day of the killing, knowing that the other parties were armed with deadly weapons and willing to fight, he cannot afterwards justify the taking of his assailant's life on the ground of necessary self-defense.

The evidence in this case strongly tended to show that the killing was done in mutual mortal combat; and where a homicide is committed in mutual combat, entered into willingly and in the knowledge of its liability to cause death to one or more of the combatants, all parties who knowingly and intentionally engage in such mutual combat are guilty of murder, unless they can prove that, before the fatal shot was fired, they had refused any further combat, and had in good faith withdrawn and sought to avoid further conflict, and that the killing was then in their necessary self-defense. *Driggers v. United States,* 1 Okla. Cr. 167, 95 Pac. 612, 129 Am. St. Rep. 823; *Id.,* 21 Okla. 60, 95 Pac. 612, 129, Am. St. Rep. 823, 17 Ann. Cas. 66; *Evans v. State,* 8 Okla. Cr. 78, 126 Pac. 586; *Wood v. State,* 3 Okla. Cr. 553, 107 Pac. 937. Upon the undisputed facts and the testimony offered on behalf of the defendant, he was guilty at least of manslaughter in the first degree.

The other assignments are untenable, and merit no discussion.

No error appearing in the record prejudicial to the substantial rights of the defendant, the judgment of the district court of Ellis county is affirmed.

ARMSTRONG, P. J., and FURMAN, J., concur.