DETERMINED IN THE

## SECOND DISTRICT

OF THE

# APPELLATE COURTS OF ILLINOIS

**DURING THE YEAR 1922.**

## J. M. Lyon, Administrator, Appellee, v. Revilo Oliver et al., Appellants.

### Gen. No. 6,995.

1. APPEAL AND ERROR—*necessity that abstract show objections to evidence.* The Appellate Court will not search the record for objections to the competency of evidence which are not set out in the abstract and will treat as competent all evidence introduced to which no objection is shown in the abstract.

2. ATTORNEYS AND COUNSELORS—*right to lien for compensation.* No attorney's lien exists by virtue of Cahill's Ill. St. ch. 13, ¶ 13, giving attorneys a lien, and a decree awarding compensation to attorneys for services cannot be sustained in equity by virtue of that act where the evidence shows that much of the work in question was done prior to July 1, 1909, when such act became in force, and that the contract of employment was made prior to that date and where the value of the services rendered after July 1, 1909, is not segregated from that rendered before that date.

3. ATTORNEYS AND COUNSELORS—*equity jurisdiction of attorney's suit for compensation.* A court of equity has jurisdiction of an attorney's suit for compensation for legal services regardless of the purely legal questions involved, where such suit was consolidated in the lower court with two other purely chancery causes involving the same parties without any objection thereto by any of the

(511)

parties interested; and having acquired jurisdiction of the cause and of the proper parties thereto, the court of equity will give full relief.

4. APPEAL AND ERROR—*evidence excluded by master as part of record on review*. A letter offered in evidence before a master, to whom was referred the cause under stipulation to file the proof taken with the clerk of the court, is a part of the record to be considered by the Appellate Court on an appeal from a decree based on the master's report where, although objection to the competency of such letter was sustained, the master ruled that it should "remain with record for consideration of court" there being no objection to the identity or genuineness of the letter.

5. EVIDENCE—*which letter admissible as part of res gestæ*. A letter written by a client to a kinsman referring to a letter that day received from his attorneys stating the terms under which they will undertake contemplated litigation and requesting the kinsman to render financial assistance in meeting the terms and containing other statements corroborative of the receipt of the letter in question by the client from his attorneys, is admissible in evidence in a suit by the attorneys for the reasonable value of the legal services rendered by them to the client in the litigation in question, as a part of the *res gestæ*, where the client's letter to the kinsman bears the same date as that on which the client claims to have received the letter from his attorneys stating the terms of their employment and where the genuineness and identity of the client's letter is not questioned and it bears internal evidence of age, it having been written twelve years before commencement of the attorneys' suit for fees, and where the statement as to the attorneys' terms was an admission against interest by the client at the time it was written, although self-serving in the attorneys' suit against the client.

6. ATTORNEYS AND COUNSELORS—*proof of terms of employment of attorneys*. A letter purporting to have been written by an attorney to a client stating the terms on which the attorney would undertake certain contemplated litigation for the client is shown to be genuine and the attorney is bound to accept compensation at the figure there shown rather than for the reasonable value of his services where, although there is expert opinion testimony that the letter is a forgery, written under a genuine signature after erasure of a former letter by acids and that it was written on a different typewriter twelve years after its purported date, there is evidence by other experts as to its genuineness and it bears internal evidence of having been written by a lawyer and its terms and the fact of its receipt by the client are corroborated by other letters written by both client and attorney at about the time of its date and evidence that the attorney recognized its terms as binding and

where the long delay of the client in producing it is explained.

7. ATTORNEYS AND COUNSELORS—*scope of employment of attorney.* A letter written by an attorney to a client stating the terms upon which the attorney would accept employment for certain litigation and referring to the attorney's employment in "the case" does not limit the attorney's employment to any one particular action which might be brought, but to all the litigation contemplated and decided by the attorney to be necessary for the protection of the client's rights, where it appears that protracted litigation was contemplated in numerous courts in different states, it being left to the attorneys to bring and conduct whatever litigation they thought proper.

8. APPEAL AND ERROR—*reversal of chancellor's findings on credibility of witnesses.* A chancellor's findings as to the credibility of witnesses may be reversed on appeal as erroneous where based upon evidence which, as to the principal issue, is chiefly documentary and opinion evidence and the original documents are certified to the Appellate Court and where from such evidence it is apparent that the decree is palpably erroneous.

Appeal by defendants from the Circuit Court of Livingston county; the Hon. STEVENS R. BAKER, Judge, presiding. Heard in this court at the October term, 1921. Reversed and remanded with directions. Opinion filed January 24, 1923. *Certiorari* denied by Supreme Court (making opinion final).

C. S. SCHNEIDER, ROBERT H. PATTON and NEIL KERR, for appellants.

H. E. TORRANCE, G. C. ARMSTRONG and WINSTON, STRAWN & SHAW, for appellee; WILLIAM WILSON and SILAS H. STRAWN, of counsel.

MR. JUSTICE JETT delivered the opinion of the court.

This is a suit in equity filed in the circuit court of Livingston county April 2, 1919, to enforce payment of fees claimed to have been due to the firm of C. C. & L. F. Strawn, for legal services rendered to Revilo Oliver, in litigation which arose after the death of Amaretta Oliver, his mother, who died on August 11, 1908, and for which services it is claimed that Flora Oliver, wife of Revilo Oliver, is also responsible.

This cause is the outgrowth of the legal quarrels of the Oliver family over lands in Livingston county, Illinois, and elsewhere. A full history of those trans-actions will be found in the following cases: *Oliver v. Oliver*, 110 Ill. 119; 119 Ill. 532; *Ross v. Payson*, 160 Ill. 349; *Oliver v. Ross*, 289 Ill. 624. C. C. Strawn, practicing law at Pontiac, in Livingston county, was in all this litigation, but he was discharged before the latter case of *Oliver v. Ross* reached the Supreme Court. Louis F. Strawn was the son of C. C. Strawn, and they were partners under the firm name of C. C. Strawn & L. F. Strawn. This suit was begun in the names of Clara F. Strawn, executrix of the estate of C. C. Strawn, deceased, and Louis F. Strawn, surviv-ing partner. Afterwards Mrs. Strawn retired from the case and an amended and supplemental bill was filed by Louis F. Strawn as surviving partner. There were amendments thereto and answers and amended answers, and a hearing, before the master, and on August 12, 1921, a decree in favor of complainant for $10,000, with directions to apply to the payment thereof certain moneys in the hands of a receiver, and if that proved insufficient then to sell the interest of Flora Oliver and Revilo Oliver in certain lands. Louis F. Strawn died the day after that decree was entered, and on September 9, 1921, J. M. Lyon, ad-ministrator of the estate of Louis F. Strawn, deceased, was substituted as complainant. Revilo Oliver and Flora Oliver prosecute this appeal from that decree, and assign that the court erred in rendering the de-cree and in not dismissing the bill of complaint. Ap-pellee assigns as cross errors that the court erred in excluding proper evidence offered by complainant and in admitting improper evidence offered by Revilo and Flora Oliver.

There is in the record oral and documentary evi-dence concerning which argument might be made that it is incompetent under the circumstances of the case,

but to which no objection appears in the abstract. Rule 16 of this court, 137 App. 625, requires the abstract to state enough to present every exception relied upon, and authorized the opposite party to file an additional abstract if he considers the original abstract incomplete. This record contains over 1,280 pages, and it is impossible that we should examine it to find other objections and it is not our duty to do so. It often happens that an attorney does not object to that which would be incompetent if objected to, because he hopes to ascertain some fact or gain some advantage by the incompetent testimony. If he does not promptly object when the cause for objection appears, he waives his right to object. He cannot wait and let the evidence go in without objection and at some future time claim it is incompetent. *Webb v. Alton Marine & Fire Ins. Co.*, 10 Ill. 223; *Doty v. Doty*, 159 Ill. 46, 53; *Rosengren v. Manufacturers Nat. Bank of Rockford*, 220 Ill. App. 608, 618. We shall treat all evidence introduced as competent where this abstract does not show an objection thereto.

Appellants contend that this is merely a suit to enforce a legal right and that it should have been brought at law, with the right to a jury trial, and that equity had no jurisdiction of the case, and that we should direct that the bill be dismissed. On July 1, 1909, an Act became a law in this State giving attorneys a lien [Cahill's Ill. St. ch. 13, ¶ 13]. After the Strawn firm had been discharged from the case in which they were rendering service, they gave notices for a lien under said statute. It was held in *Baker v. Baker*, 258 Ill. 418, that said Lien Act does not apply to contracts made between attorneys and clients before that act took effect. The original bill alleged that this contract was made in the latter part of 1909, and it sought a lien under that statute, and complainant sought to prove that there was no real contract until the latter part of 1909. We are satisfied from

the proofs that the contract was made in the last days of 1908 or the first days of 1909, and that no attorney's lien existed by virtue of that statute, in force July 1, 1909 [Cahill's Ill. St. ch. 13, ¶ 13], and especially not as to services performed before July 1, 1909. Much work had been done before July 1, and the witnesses to the value of the services made a general estimate, covering all the services and made no estimate of the value of those rendered after July 1, 1909. The decree therefore cannot stand as supported by the Lien Act. But the argument that therefore the bill ought to have been dismissed for lack of equity fails to take proper account of later events. Before the Strawn firm retired from the case in which they were employed, Flora Oliver, on July 31, 1914, filed for record a deed of that date from Revilo Oliver for nearly all his real estate, and also on September 4, 1914, filed for record a quitclaim deed of his remaining real estate. Thereby Revilo Oliver divested himself of all his real estate, and became insolvent, and these deeds were without consideration, and the court was asked by a subsequent amendment to set them aside as to complainant, and also to compel Flora Oliver to pay complainant said fees by virtue of the following provision in said quitclaim deed: "And the grantee hereby assumes and agrees to pay all the indebtedness the said grantor now owes, but shall not become liable for such indebtedness until she comes into possession of said above-described property." The voluntary conveyance by Revilo Oliver to his wife of all his property, without consideration and thereby making himself insolvent, gave a court of equity jurisdiction to render relief to a creditor. This, however, usually requires that a judgment at law be first obtained. But on March 26, 1920, an order was entered consolidating this cause, which was No. 5,099 in the court below, with two other chancery causes, one of them No. 4,141, the suit of

*Oliver v. Ross,* to set aside certain conveyances to Mrs. Ross, the sister of Revilo Oliver, and with No. 5,182, a partition suit between the Oliver heirs relating to the same lands. No objection was made by any of the parties to such consolidation. Neither appellee nor appellants assign for error this order of consolidation. It must therefore be treated here as having been by consent. It is not contended but what No. 4,141 and No. 5,182 were each of them causes of which equity had complete jurisdiction. This cause was therefore consolidated with causes of which a court of equity had jurisdiction. When a court acquires jurisdiction of an equitable cause and of proper parties it will give complete relief, even if some portion of the relief, taken by itself, would be a legal remedy only.

We therefore conclude that whatever the case may have been at its inception, appellants cannot now contend that the court did not have jurisdiction to grant relief in this cause.

There is in evidence a certain exhibit "D" typewritten on two sheets, bearing at the top of each an elaborate printed letterhead of C. C. and L. F. Strawn, dated at "Pontiac, Illinois, December 15, 1908," addressed to "Mr. Revilo Oliver, Iowa Park, Texas," and bearing the genuine signature of C. C. Strawn, a member of said firm, the body of which is as follows:

"Our next term of Circuit Court sets January 12, 1909, and your case must be in by Saturday, the 2nd, or you cannot get in before May. If I am to begin any case for you I must have at least a week's time to prepare the papers. Then you must have service on the defendants by January 2nd, ten days before the first day of the term, beginning on the 12th, as above stated. This I cannot do until I receive my retainer and sufficient money to pay the clerk's advance fees and the sheriff's advance fees for the service of summons on the defendant. I write so that you may

know what you are doing and what you have to do to get into this term of court. You should send my retainer of $100 at once, so I can begin the suit. As to my fees I will charge you $2,000 for the time I devote in the preparation of the case and $20 a day for taking testimony before the master, and $10 a day and expenses for services rendered out of the county. I think this a reasonable fee considering the amount involved."

It is contended that this letter is a forgery; that some other and different letter had been written in the space occupied by that exhibit, and had been erased by the use of acids, and that the present letter was written in August or September, 1920, and after much of the evidence in this case had been taken. The court below found it a forgery and disregarded it in entering its decree, and allowed the complainant what the services of C. C. and L. F. Strawn were reasonably worth under the evidence. Exhibit "D" was offered in evidence by appellants in September, 1920, and after much evidence had been heard before the master at various sessions in previous months. The hearing was then postponed to give appellee an opportunity to examine exhibit "D." Appellee's solicitors took it away from the master without the knowledge of appellants. Appellee's solicitors employed experts who applied what is known as the litmus test, whereby they produced certain results to which they testified. In August, 1920, Revilo Oliver and his wife were living in Springfield, Illinois, and had with them a son, Revilo Oliver, Jr., eleven years old. Appellee ascertained and afterwards proved that shortly after August 1, 1920, Revilo Oliver went to the Springfield office of the Royal typewriter and ascertained that that company rented typewriters, and saw a particular machine and took a sample of its typewriting on paper, and said that he had a boy who wanted to do writing; that on August 18, Oliver came back to that office with the same sheet of paper

and with other kinds of typewriting on it beside that made on the Royal, and had some kind of a mark on the sample that had been typewritten on the Royal machine, and rented the machine for a month and had it delivered at his house. Appellee caused various sheets of paper to be written upon that particular Royal machine; and also on a certain sheet called exhibit No. 170 caused to be copied on said machine the body of said exhibit "D." Appellee's experts caused parts of exhibit "D" and like parts of exhibit "170" to be photographed and enlarged, and they therefrom testified that unquestionably exhibit "D" had been written upon that new Royal machine, upon which typewriter they had also copied it as exhibit "170." Appellants called other experts who pointed out various differences between the type in exhibit "D" and in exhibit "170," and testified that exhibits "D" and "170" could not have been written upon the same machine. Appellee's experts had for many years been engaged in the study and examination of questioned documents, and no doubt possessed much skill. Their evidence is subject to the criticism that two of them were paid $100 per day and another $75 per day; that it is obvious that if they had determined that exhibit "D" was not a forgery or that it was not written upon said Royal typewriter, they would not have been called as witnesses and would not have received $100 per day or $75 per day. It was made for their interest to find and testify to reasons for believing that exhibit "D" was written on that Royal typewriter. They occupied the position of paid advocates. Such evidence has frequently been commented upon unfavorably in textbooks and decisions of the courts. The experts called by appellants were business men, such as a banker, an instructor in the use of typewriters in schools for many years and the like. They were paid more than their legal fees as witnesses, but apparently not more than enough to com-

pensate them for going from their places of business in other counties to the place where they testified.

They, no doubt, had less skill than the experts called by the appellee, but were not subjected to the same considerations of self-interest. In considering this question appellee is entitled also to the benefit of the fact that the original answer did not set up this letter or any contract in writing, and appellants did not produce this letter until September, 1920, and it was not until July 30, 1921, that Oliver so amended his answer as to set up the terms of said exhibit "D." Appellants sought to explain this delay by evidence that they supposed the letter to be lost, and had in fact placed it and much other correspondence with C. C. Strawn, first in the hands of a lawyer dead at the time of the hearing, and afterwards in the hands of a relative in another town where they remained some years. Appellants offered a letter dated April 27, 1919, which they claim was sent with said package of papers, and the envelope in which it was claimed said letter and papers were inclosed, postmarked at Springfield, Illinois, April 28, 1919, and addressed to said relative. This evidence was excluded. Appellants showed that at a late stage in the trial said relative was about to remove from the State, and Mrs. Oliver went to visit her and there found a package of Strawn letters which she took back to Springfield and there the package was examined and this lost letter was found. It is disclosed by the record in this cause that Oliver wrote Strawn a letter from Iowa Park, Texas, dated November 2, 1908, in which he tells Strawn of his mother's death and of a letter he had had from Mr. Goodell, of Loda, Illinois, and discussed his own property rights and his opinion that there should be a bill filed in Livingston county to set aside conveyances from his mother to his sister, Mrs. Florence Ross, and said that he had requested Goodell "to write you and secure your services if you are not

retained by any one adverse to the terms of the will.''
Other evidence shows that Revilo's mother had left
two wills, one favorable to Mrs. Ross and the other
treating all her children equally. Under date of No-
vember 17, 1908, Oliver wrote Strawn a long letter
from Texas, in which he said he had told Goodell to
send Strawn all papers. He states certain facts and
says he hopes that statement will enable Strawn to
draw a bill in chancery to set aside the fraudulent
transfers. He says a bill in chancery should be filed
and an injunction procured and wishes Strawn to at-
tend to it at once and says he wants Strawn to handle
this case for him. Under date of December 1, 1908,
Oliver wrote Strawn that Goodell would not help him
and he must find some one else to furnish the money,
and that as soon as he could find said person, he would
send a retainer of $100 "as stated in your letter."
Here follows in order of time the disputed letter, ex-
hibit "D," dated December 15, 1908, and addressed to
Oliver in Texas. Oliver testified that he received this
letter. He produced an envelope in which he testified
it was received by him. That envelope bears the post-
mark of Pontiac, December 15, 1908, and of Iowa
Park, Texas, December 18, 1908. There is proof that
Strawn had a Royal typewriter in his office in De-
cember, 1908, and that more than one person worked
for him on it. Mrs. Oliver testified that she saw ex-
hibit "D" in Texas when her husband received it.
Before the master appellants offered exhibit "K"
which was a letter Oliver wrote Max Lang at Mt.
Olive, Illinois, and bore date of December 18, 1908;
this letter was sent through the mail from Iowa Park,
Texas, and in which letter Oliver said he had just re-
ceived a letter from C. C. Strawn of Pontiac, Illinois,
wanting him to send him $100 and adding: "he says
his fees for handling my case will be $2,000, besides
$20 a day for taking the evidence." He asks Lang
to send Strawn $100. Oliver testified "exhibit 'K' is

in my handwriting and bears my signature. It was written at the time of the date mentioned at the top of the letter. It was written to Max Lang. It was sent to him through the regular course of mail from Iowa Park, Texas. It came to my hands again today. It was sent from Max Lang to Mr. Kerr here. I got it at his office. Exhibit 'L' is the envelope it came in. I got it out of that envelope in his office. That is the first time I have seen it since I wrote it.'' At the time exhibit ''K'' was offered, appellee objected and the ruling of the master is as follows: ''Objection to letter and envelope, on ground it consists of self-serving declarations and is otherwise incompetent, irrelevant and immaterial; sustain objection, same to remain with record for consideration of court.'' In this state of the record it is insisted by appellee that exhibit ''K'' is not before the court for consideration and should not be considered in determining the issue involved in this case. It will be remembered that the record discloses that the master, by reason of a stipulation entered into, should file with the clerk of the court, in which the cause was pending, the proof taken in this case. In other words, the master was to report the testimony without any conclusions of law or fact. The assignments of errors by appellants are as follows: First, the court erred in rendering the decree herein; second, the court erred in not dismissing the bill of complaint.

In the suit of *Goelz v. Goelz*, 157 Ill. 33, the appellants claimed that all of the testimony given by appellee, himself as a witness, was incompetent and should be disregarded. The appellee replied that objections to the competency of a witness or to testimony cannot be made for the first time in the Supreme Court, and that no objections were interposed before the master, and that no objections or exceptions to the testimony of appellee were filed in the court below. On pages 39 and 40, in deciding the

question of practice and announcing the rule in such cases as arise on a state of facts as above indicated, the court said: "Neither the claim of appellee nor that of appellants is well grounded. It is to be borne in mind that the question, here, does not go to mere matter of informality or irregularity, which might be cured in the trial court. The question before us concerns the legal competency of certain evidence, and the question arises, not in an action at law, but in a suit in equity." In *Swift v. Castle,* 23 Ill. 209, the court said: "The question presented upon the trial before the chancellor, as well as in the Appellate Court, is, upon all the legitimate evidence in the cause, what decree should be rendered. The chancellor being the judge of both the law and evidence, the presumption is that in rendering his decree he will only regard that which is legal and pertinent.  *  *  *  It is the correct practice for the chancellor, after the evidence is heard, to regard no portion of it which is immaterial or illegal, and to decide the case alone on the legal evidence adduced. Such is believed to have been the uniform practice, which has been adopted from considerations of convenience, and is in no way calculated to hinder or delay the administration of justice, and no reason has been suggested, nor is any perceived, why it should be changed." In *Treleaven v. Dixon,* 119 Ill. 548, it was said: "In chancery cases the whole record, including all the evidence offered, is before us, and we are required to assume that all the incompetent evidence was rejected and all the competent evidence was admitted and considered on the final hearing. If there is competent evidence in the record sufficient to sustain the decree, it must be affirmed; if not, it must be reversed,—and this without regard to whether the chancellor may have been right or wrong in his views as to the competency of the evidence at the hearing." In *Wylie v. Bushnell,* 277 Ill. 484, at a hearing before the master, plain-

tiff in error offered in evidence a series of exhibits, to which defendant in error objected, before the master. No ruling was made by the master on the objections. The order of reference provided that he should report the evidence without reporting his conclusions thereon. In deciding the question thus raised, on pages 494 and 495, the court said: "Usually a master is governed by the ordinary rules of evidence by which a court would be governed, and he should hear and exclude evidence as if the hearing were before the court. (17 Encyc. of Pl. & Pr. 1023.) But if.it is not entirely clear that the evidence is incompetent the master should permit the testimony taken down subject to objection, so that it may be afterwards considered without a re-reference if the master's rulings as to such evidence should be held to be incorrect. The holdings of this court as to the master's authority as to ruling on the admission and exclusion of evidence have been collected and fully discussed, with other authorities, in *Ellwood v. Walter*, 103 Ill. App. 219, and we do not deem it necessary to restate them here." In the light of these authorities quoted from, together with the exhaustive discussion by the late Justice Dibell, in *Ellwood v. Walter, supra,* we are of the opinion and so hold that exhibit "K" is a part of this record and is proper to be considered by this court. We have a case in which Oliver is charged with the forgery of a document, which is a controlling factor in this cause. He testifies that on the day he received exhibit "D" he wrote exhibit "K" to Lang at Mt. Olive. He not only testifies to writing Lang, but produces in corroboration of his testimony the letter written. This letter bears the earmarks of age and so discloses upon personal examination of the same. It will be seen that there was no objection to the introduction of exhibit "K" on the ground that its identity was not sufficiently established. Twelve years intervened before there was any suggestion of Oliver inventing the scheme

charged against him. No effort was made to show that it was a recent fabrication. The letter, exhibit "K," was the natural and spontaneous utterance of Oliver. The contention of appellants that exhibit "K" is admissible is supported by authority.

In the case of *Waller v. People,* 209 Ill. 287, the law applicable in this connection is well stated as follows: "As a general rule, proof of statements made by a witness out of court harmonizing with his testimony is inadmissible, but where it is charged that his story is a recent fabrication, or that he has some motive for testifying falsely, proof that he gave a similar account of the transaction when the motive did not exist or before the effect of the account could be foreseen is admissible." Exhibit "K" is admissible as a part of the *res gestæ.*

The *res gestæ* have been defined as those circumstances which are the undesigned incidents of a particular litigated act, and which are admissible when illustrative of such act. The ground for the admissibility of such declarations is that they are the natural and spontaneous utterance of the declarant, so closely connected with the transaction in question as to be in effect a part of it, there having been no opportunity for premeditation or design. Elliott on Evidence, sec. 538.

It is a general rule that where evidence of contradictory statements is offered to impeach the credit of a witness, evidence of statements made by him on former occasions, consistent with his evidence, is inadmissible. But where it is charged that the evidence of the witness is a recent fabrication, and is the result of some relation to the party or cause, or of some motive or personal interest, his evidence may be supported by showing that he had made a similar statement before that relation or motive existed. *Driggers v. United States,* 1 Okla. Cr. 167, 129 Am. St. Rep. 823; 40 Cyc. 2789; 22 Corpus Juris, page 230, sec. 202. Un-

der the rule as announced in volume 10 Ruling Case Law, page 974, sec. 157, and page 978, sec. 161, this letter is admissible as a part of the *res gestæ*. This letter was the moving force which resulted in the $100 retainer being sent to Strawn. Even if considered as a self-serving declaration, being part of the *res gestæ*, it is admissible. 22 Corpus Juris, page 230, sec. 201.

But at the time it was written it was not self-serving, but was a distinct admission of liability against himself. In the light of the fact that Oliver wrote this letter December 18, 1908, and in it incorporated this contract exactly as it is now contended it was written, how can it be possible that he invented the same and wrote it out on a Royal typewriter rented by him in August, 1920? We are of the opinion that this letter, exhibit "K," destroys the theory of the appellee in this case.

It further appears from this record, that under date December 21, 1908, Oliver wrote Strawn from Texas that he had made arrangements with a party at Mt. Olive, Illinois, to furnish the money for attorney fees and he supposed Strawn would receive his check for $100 by the time this reached him. He asked Strawn to ascertain the exact amount necessary to pay clerk's and sheriff's charges and he would have Lang (Mr. or Mrs. Lang being his relatives at Mt. Olive) send him a check for the amount. He states at length what he wants done but leaves it to Strawn to decide which course to pursue, and to prepare papers accordingly. Under date of January 4, 1909, Oliver writes Strawn from Texas that he received Strawn's letter too late to get the clerk's and sheriff's charges to Strawn as soon as requested but that he supposes Strawn has received the money from Lang before that, and he discusses getting service on the parties and asks for a typewritten copy of the bill filed in court. On the same day, January 4, 1909, Strawn wrote a letter to Oliver, saying he did not receive the money for ad-

vanced clerk's and sheriff's fees as expected, and did not commence any suits to the January term, 1909. He then asks Oliver for information on various points at his very earliest convenience. Under date of January 20, 1909, Oliver wrote Strawn from Texas a very lengthy letter in answer to the questions Strawn had previously put, and indicated how he wanted the bill of complaint drawn. Oliver testified to a conversation with Strawn in Texas in 1909, in which Strawn said to him that he would charge him $2,000 for the preparation of the case and the time in court, and that he ought to have $20 a day for taking testimony before the master and also $10 per day when employed out of the county. At a later date Oliver became dissatisfied with Strawn and sought to employ Schneider & Schneider of Paxton and Schneider did not wish to go into the case if not agreeable to Strawn and they went together to Pontiac and saw Strawn, and Strawn was not willing that Schneider should go into the case and said that "if you do have him you will pay me $2,000." It appears that Strawn went to Texas twice in these matters. The deposition of C. C. Davis, of Iowa Park, Texas, was taken. He testified to a conversation with Strawn in Texas, in 1911 or 1912, in which this litigation was discussed, and that Strawn told him that he had this litigation under contract for $2,000 and $20 a day for each day spent in court. That Strawn did have a long talk with Davis about Oliver's case at Iowa Park, Texas, is proved by a letter in evidence, written by C. C. Strawn. When all this correspondence and this testimony are considered and also the framework of exhibit "D," which was obviously written by a lawyer and fits into the situation, we are convinced that exhibit "D" was a genuine letter.

It was received by Oliver, and soon after by his procurement the retainer of $100 was paid to and accepted by Strawn, and the contract became complete. Strawn & Strawn acted under it until they were dis-

charged by Mrs. Oliver after she had placed on record deeds from her husband conveying to her the lands which were the principal subject of the litigation. This discharge excused Strawn & Strawn from further performance, and entitled them to recover the fee of $2,000 and $20 per day for taking testimony before the master and $10 per day and expenses for services rendered outside of Livingston county. The words "the case" did not refer to any one case which might be brought but to such litigation as might be concluded to be advisable in securing to Oliver one-third of the property his mother had owned. She had recently died. She had made deeds adverse to Oliver. She had made two wills, one adverse to Oliver and the other favorable to him. It was in contemplation that this will favorable to him should be probated in Texas, where the mother died, that probate of the other will should be resisted in Illinois, where it was to be presented for probate; that a bill in equity should be filed in Livingston county, Illinois, where most of the lands were, to set aside deeds by the mother to Mrs. Ross; that a suit for partition of the lands should be brought there; that proceedings should be brought to prevent Mrs. Ross from getting the rents of the lands; that a suit for slander should be brought by Oliver against Mrs. Ross; and that some suit might be necessary in Indiana where some of the lands seem to have been. It was left to Strawn & Strawn to bring and conduct whatever litigation C. C. Strawn thought proper to enforce and protect the rights of Oliver. The sums named were to be the compensation of Strawn & Strawn in such litigation.

The conclusion thus reached necessarily works a reversal of this cause. It is suggested, however, that the chancellor having seen and heard the witnesses on the question of forgery, his findings as to the credibility of the respective witnesses should not be disturbed unless plainly and palpably erroneous. The evidence

bearing upon the issues of fact as to whether there was a contract between appellant, Revilo Oliver, and C. C. Strawn in his lifetime fixing the amount to be paid for services rendered to said appellant is very largely documentary, and opinion evidence, and the original documents being certified to this court, this court is required, under the law, to weigh the evidence, and the rule applicable in cases where the decision turns chiefly upon the credibility to be extended to witnesses, heard in open court, by the chancellor, is not applicable. The rule as announced in the case of *Bordner v. Kelso,* 293 Ill. on page 186, seems to be and in our opinion is applicable here, and is as follows: "There is in the record practically no contradiction of any statement of fact on which any witness based his or her opinion concerning the mental capacity of the deceased, the disagreement in the testimony being largely a difference of opinion of the various witnesses concerning that matter. This court is therefore placed in a much better position to weigh the testimony and the opinions of the various witnesses than in cases where there is a sharp controversy in the testimony and where the appearance and presence of the witnesses while testifying are of more importance. While it is the rule that this court will not disturb the findings of the chancellor unless manifestly against the weight of the evidence, yet where such is the condition of the record this court will not hesitate to set such findings aside."

The real issue of fact in this case was the question whether exhibit "D" was a genuine document or a forgery. The evidence turns largely upon the expert testimony or opinion evidence of experts, and an inspection of the documents themselves. While some of the conflicting evidence in the case may shed some light on this issue, a proper analysis of the documentary evidence is conclusive on this issue.

The question presented upon the trial before the

chancellor, as well as in this court, is, upon all the legitimate evidence in the case, what decree should be rendered? We are not in a position to know just what the chancellor held to be the legitimate evidence in the cause. There is nothing in the record to indicate that the chancellor, as such, held any different views relative to exhibit "K" than he held as master. Exhibit "K" was before the chancellor and properly so. From the conclusion reached by the chancellor it is evident that he regarded exhibit "K" as inadmissible. As exhibit "K" was admissible and before this court, we have given the same consideration in reaching the conclusion we have reached. If the chancellor did not consider exhibit "K" and find it was a spurious letter, the decree rendered finding exhibit "D" a forgery was necessarily largely based upon the expert evidence heard on the part of appellee, and the record discloses the fact that these experts, or some of them in their demonstration before the master, failed to restore ink on exhibits "D" and "H," which they had in effect said they could do. This diminished the weight to be given to their theory that exhibit "D" had been written in type over an erased ink letter. It is quite impossible to refer to each fact and circumstance in this case that bears upon the contention of the respective litigants. We have considered all of the suggestions made in the able arguments presented and while they may not be reflected in this opinion, they have received consideration. We therefore conclude that the decree of the court below should be reversed and the cause remanded with directions to the lower court to enter a decree finding that there was a valid contract between C. C. & L. F. Strawn and Revilo Oliver in the terms above stated, and that appellee is entitled to recover thereunder $2,000 and $20 a day for the time spent before the master in taking testimony and also $10 a day and expenses when Strawn was required to be outside of the county in this busi-

ness, less such sums as Strawn & Strawn may have received thereunder, and finding the deeds to Mrs. Flora Oliver void as to complainant, and referring the cause to the master to consider the certificate of evidence already on file, and to take and report such further evidence as the parties may desire upon the question of the accounting, and also on the question whether Mrs. Flora Oliver has received possession of the premises described in the quitclaim deed from her husband to herself, and to report the proofs and the state of the account to the court, and for further proceedings not inconsistent with this opinion. If Mrs. Oliver has received possession of the premises conveyed by the quitclaim deed to her, the decree should also be against her for the amount due.

*Reversed and remanded with directions.*